**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**


**DONALD MANNING**

      **Plaintiff,**

**vs.**                                          **CASE NO. 1:08CV164-MP/AK**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This action is brought pursuant to 42 U.S.C. § 405(g) of the Social Security Act (Act) for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits (DIB) under Title II.

Upon review of the record, the Court concludes that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## A.     PROCEDURAL HISTORY

Plaintiff filed an application for DIB on November 28, 2005, alleging a disability onset date of November 10, 2005, because of pain and numbness in his hands and fingers.  Plaintiff petitioned for a hearing before an administrative law judge (ALJ), who conducted a hearing on July 17, 2007, and entered an unfavorable decision on

November 13, 2007.  The Appeals Council denied Plaintiff's request for review, thus making the decision of the ALJ the final decision of the Commissioner.  This action followed.

## B.    FINDINGS OF THE ALJ

The ALJ found that the Plaintiff had a severe impairment, Raynaud's disease, which causes numbness in his hands and fingers, but that this did not meet the listings. Further, despite his impairment, Plaintiff has the residual functional capacity to perform light work.  (R. 17).  The ALJ determined that the record showed that Plaintiff's impairment could "reasonably be expected to produce the alleged symptoms" but not to the level of "intensity, persistence and limiting effects" that the Plaintiff describes.  (R. 20).  In making this finding, the ALJ examined objective medical evidence; treating physician opinions; the Plaintiff's daily activities; location, duration, frequency, and intensity of Plaintiff's symptoms; medication Plaintiff takes to alleviate symptoms; and treatment for symptoms.  (R. 17-18).

The ALJ found that most of the Plaintiff's two primary treating physicians' opinions were consistent with the rest of the record, including non-treating state agency opinions and Plaintiff's daily activities; and therefore, supported a functional assessment that Plaintiff could perform light work.  (R. 20, 22).  In doing so, the ALJ gave weight to treating physicians' opinions that were bolstered by the overall record.  However, the ALJ rejected treating physician Dr. Powell's opinion in July 2007 that Plaintiff was unable to work since November 2005 because this statement contradicted the rest of

**No. 1:08CV164-MP/AK**

the record, including Dr. Powell's January 2006 treatment note that Plaintiff was capable of returning to work as long as Plaintiff did not operate vibrating equipment and avoided exposure to cold materials and caustic chemicals. (R. 20).

In addition, the ALJ found that, based upon the testimony of a vocational expert, there are significant numbers of jobs available regionally and nationwide that only require Plaintiff to perform light work. (R. 21). Therefore, Plaintiff is not disabled and can find work performing one of these jobs.

## C.   ISSUES PRESENTED

Plaintiff argues that the ALJ erred in rejecting the opinion of his treating physician who found him to have an "extreme inability to complete a normal workday and workweek without interruptions" and therefore incorrectly found Plaintiff had a residual functional capacity for light work. (Doc. 12, at 3).

Plaintiff also argues that the ALJ improperly interpreted the testimony of the vocational expert and that the vocational expert's testimony does not provide substantial evidence in favor of the ALJ's finding that Plaintiff is not disabled. (Doc. 12, at 6).

The Commissioner responds by explaining that the ALJ appropriately discounted Plaintiff's treating physician's July 2007 assessment for good cause because it was "inconsistent with the treatment record and was contradictory" with the same treating physician's January 2006 opinion, which stated that Plaintiff could work with restrictions. (Doc. 16, at 5, 6). In addition, the statement at issue was conclusory in that it was not accompanied by corresponding treatment notes. The ALJ explained that he gave credit

**No. 1:08CV164-MP/AK**

to the treating physician's opinions that were supported by objective medical evidence and the rest of the record, including the same treating physician's notes and opinions; other treating physicians' medical opinions; the Plaintiff's daily activities; location, duration, frequency, and intensity of Plaintiff's symptoms; medication Plaintiff takes to alleviate symptoms; and treatment for symptoms.  (R. 20).

Further, the government argues that the ALJ properly applied the vocational expert's testimony.  The vocational expert testified that Plaintiff could perform several unskilled jobs, such as a courier, ticket taker, cashier/ticket seller, and small-products assembler.  (Doc. 16, at 7, 8).  Additionally, the ALJ properly disregarded the vocational expert's testimony regarding a second interrogatory question that assumed an inability to complete a normal workday and workweek because this assumption was "not the residual functional capacity that was determined by the ALJ."  (Doc. 16, at 7).  Rather, the ALJ determined Plaintiff could perform light work during the course of a normal workday and workweek, and therefore, this second interrogatory was irrelevant.

The issue thus presented is whether the Commissioner's decision that Plaintiff is not disabled is supported by substantial evidence in the record and decided by proper legal standards.

D.    <u>**STANDARD OF REVIEW**</u>

Title 42 U.S.C. § 405(g) sets forth the standard of review for this court.  The Commissioner's decision must be affirmed if it is supported by substantial evidence and the correct legal standards have been applied.  <u>Graham v. Apfel</u>, 129 F.3d 1420, 1422

**No. 1:08CV164-MP/AK**

(11th Cir. 1997).  Findings of fact by the Commissioner which are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g). <u>Miles v. Chater</u>, 84 F.3d 1397, 1400 (11th Cir. 1996).  "Substantial evidence" has been defined to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citation omitted) (per curiam).  It is more than a scintilla, but less than a preponderance.  <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted).  The court may not reweigh the evidence or substitute its judgment for that of the Commissioner.  <u>Wolfe v. Chater</u>, 86 F.3d 1072, 1076 (11th Cir. 1996).  It must determine only if substantial evidence supports the findings of the Commissioner.  <u>See</u> <u>Bridges v. Bowen</u>, 815 F.2d 622, 624 (11th Cir. 1987) (per curiam).  Even if substantial evidence exists which is contrary to the Commissioner's findings, where there is substantially supportive evidence of the Commissioner's findings, the court cannot overturn them.  <u>Barron v. Sullivan</u>, 924 F.2d 227, 230 (11th Cir. 1991).  Unlike the deferential review accorded to the Commissioner's findings of fact, his conclusions of law are not presumed valid. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  The Commissioner's failure to apply correct legal standards or to provide the reviewing court with an adequate basis for it to determine whether proper legal principles have been observed requires reversal.  <u>Id.</u> (citations omitted).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

**No. 1:08CV164-MP/AK**

expected to result in death or which has lasted or can be expected to last for a
continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). To
qualify as a disability the physical or mental impairment must be so severe that Plaintiff
is not only unable to do his previous work, "but cannot, considering his age, education,
and work experience, engage in any other kind of substantial gainful work which exists
in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in
five steps:

1.   Is the individual currently engaged in substantial gainful activity?

2.   Does the individual have any severe impairment?

3.   Does the individual have any severe impairments that meet or equal those
     listed in Appendix 1 of 20 C.F.R. Part 404?

4.   Does the individual have any impairments which prevent past relevant
     work?

5.   Do the individual's impairments prevent any other work?

A finding of disability or no disability at any step renders further evaluation
unnecessary. Plaintiff bears the burden of establishing a severe impairment that keeps
him from performing his past work. If Plaintiff establishes that his impairment keeps him
from his past work, the burden shifts to the Commissioner at step five to show the
existence of other jobs in the national economy which, given Plaintiff's impairments,
Plaintiff can perform. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986);
MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner

**No. 1:08CV164-MP/AK**

carries this burden, Plaintiff must prove that he cannot perform the work suggested by the Commissioner. <u>Hale v. Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987). It is within the district court's discretion to affirm, modify, or reverse a Commissioner's final decision with or without remand. 42 U.S.C. § 405(g); <u>Myers v. Sullivan</u>, 916 F.2d 659, 676 (11th Cir. 1990).

## E.   SUMMARY OF Plaintiff'S RELEVANT MEDICAL HISTORY

Plaintiff first complained of coldness and numbness in his hands and right arm in December 2003. (R. 216, 253, 261). A pulse waveform study of Plaintiff's upper arms, lower arms and hands in April 2004 showed a severe arterial insufficiency in Plaintiff's hands. (R. 316). On May 4, 2004, Dr. Rodger D. Powell performed an carotid arch angiogram and a right upper extremity arteriogram, finding that "the digital arteries of the second, third, and fourth fingers" of Plaintiff's right hand were "abnormal" and showed "multiple areas of apparent narrowing and occlusion with recanalization via collaterals," which indicated that Plaintiff may have a "spastic type of Raynaud[']s syndrome." (R. 216-217, 250). Plaintiff's middle fingers showed the greatest symptoms of coldness and numbness. (R. 242, 245, 253). As a result of the angiogram and arteriogram findings, Dr. Powell performed surgery on June 2004 to treat nonhealing ulcers on Plaintiff's fingers. (R. 245-248, 309).

From May 2004 through Plaintiff's ALJ hearing on July 17, 2007, Plaintiff sought treatment for his Raynaud's from Dr. Powell at The Orthopaedic Institute as well as Dr. Selden Longley at the Arthritis & Osteoporosis Center. (R. 228, 230, 301, 309). In

**No. 1:08CV164-MP/AK**

addition, Plaintiff sought treatment for his pulmonary problems, including hoarseness and cough, from pulmonary specialist Dr. Robert Greenberg from February 2003 through April 2006 and ENT specialist Dr. Brian Kerr from July 2005 through October 2005. (R. 270, 272, 275, 282, 287, 289).

Also in May 2004, Plaintiff sought treatment and tests for his cardiovascular and pulmonary problems, including undergoing a fiberoptic bronchoscopy to examine the underlying cause of his idiopathic pulmonary fibrosis, thickening of the lungs without a known cause, and chest x-rays to examine nodules and intertitial markings in both lungs. (R. 210-215, 221).

In April 2005, because of Plaintiff's continued problems with hand numbness, ulcerations on fingers and cold fingers, Dr. Powell referred Plaintiff to Dr. Longley to determine whether Plaintiff suffered from an underlying condition, such as lupus or scleroderma, that could cause Plaintiff's Raynaud's. (R. 239). Dr. Longley diagnosed Plaintiff with Raynaud's and limited scleroderma, or CREST syndrome, which is one subtype of scleroderma, a condition that literally means "hardened skin."[1] Dr. Longley treated Plaintiff between November 2005 and April 2006 by prescribing Verapamil, Nifedipine, and Norvasc, calcium blockers which dilate blood vessels. (R. 230, 232, 234, 235, 301). On January 18, 2006, during an office visit, Dr. Longley remarked in his treating notes that Plaintiff's Raynaud's was "not as prominent as winter of 2004-2005." (R. 228).

---

[1] http://www.mayoclinic.com/health/crest-syndrome/DS00580 (Last visited Nov. 30, 2009).

No. 1:08CV164-MP/AK

In November 2005 and January 2006, Dr. Powell examined Plaintiff and noted that while Plaintiff's fingers were cool, there were no ulcerations and recommended that Plaintiff return to work but avoid vibratory equipment, cold exposure, or caustic chemical exposure. (R. 236, 237). Dr. Powell also completed a Work Status Form on November 9, 2005, stating that Plaintiff was able to return to work and was capable of working a full eight-hour workday. (R. 238). In January 2006, Dr. Powell ordered Plaintiff to undergo nerve conduction studies to ensure his carpal tunnel syndrome was not worsening his circulatory problems. According to Dr. Powell, "EMGs and nerve conduction studies only showed borderline right median nerve compression." (R. 253, 313, 315). At this same office visit, Dr. Powell remarked that Plaintiff "can work as long as he avoids vibratory equipment, any cold exposure, or any caustic chemical exposure." (R. 236).

In an April 2006 office visit, Dr. Longley observed in his treating notes that Plaintiff's Raynaud's was not active that day, that there were no ulcers or infarctions on Plaintiff's hands, and that Plaintiff did not have progressive systemic sclerosis. (R. 301-302). Finally, in May 2006, Dr. Powell observed that Plaintiff complained of increased numbness and tingling in his hands. (R. 312). However, Dr. Powell also noted that the most recent nerve conduction studies conducted in May 2006 were within normal limits. (R. 312).

In April 2006, Plaintiff visited Dr. Greenberg for a follow-up regarding his periodic hoarseness and persistent cough. (R. 272). Dr. Greenberg recommended a repeat

**No. 1:08CV164-MP/AK**

chest x-ray and pulmonary function studies, which revealed findings consistent with

Plaintiff's earlier diagnosis in 2003 of pulmonary fibrosis.  (R. 270, 273, 282, 284).

In March 2007, Plaintiff underwent an ultrasound of the abdomen, which revealed

a 6.4 cm mass in his left kidney, which was suspected to be cancerous.  (R. 300).  A CT

scan of his abdomen was recommended.  There is no record of this CT scan in the

record.

F.      **SUMMARY OF THE ADMINISTRATIVE HEARING**

Plaintiff was 48 years old at the time of the hearing, had a 12th grade education,

and last worked in November 2005 as a hospital cleaner.  (R. 32, 89, 91, 133, 191).  His

primary problem is his Raynaud's syndrome, which causes his hands and fingertips to

be especially cold and often numb.  He is unable to continue his prior work as a hospital

cleaner because his hands are painful and numb every day even though he takes

Nifedepine, a calcium blocker used to treat the symptoms of Raynaud's syndrome.  (R.

35-36).  He is able to hold a pen in his hand and write continuously for up to 20 minutes

before his hand goes numb, can sit for a couple of hours and can stand without

limitation.  (R. 37-38).  His hand numbness goes away when he moves his hands.  (R.

36-37).  Plaintiff is only allowed to lift up to 20 pounds but previously was able to lift up

to 40 pounds, is not permitted to handle electrical equipment, and can perform

sweeping or similar tasks for one or two hours before needing to take a 20- to 30-minute

break.  (R. 38-40).

**No. 1:08CV164-MP/AK**

Plaintiff fixes his own meals, performs light housework, takes care of his personal hygiene, goes to the grocery store about once per week, and attends basketball games with his 13-year-old son once per week. (R. 41-43). In addition, Plaintiff leaves his home to visit friends and family members, and goes to the mall. (R. 43).

Plaintiff sees Dr. Powell once or twice per month. He has received both short-term and long-term disability payments from his previous employer, Long Wood General Hospital, and also settled a Worker's Compensation claim against the hospital about four months before the administrative hearing. (R. 46). When he attempted to return to his previous work, the hospital told him that they did not have any work for him given his restrictions of no contact with water or electrical equipment as directed by Dr. Powell. (R. 47-48).

Two different hypotheticals were posed to the vocational expert by interrogatories on August 10, 2007, after the administrative hearing. (R. 194-195). The first hypothetical posed to the vocational expert was a residual functional capacity to perform light work with the following limitations: (1) avoid moderate exposure to extreme cold; and (2) avoid concentrated exposure to vibration. (R. 197). The expert responded that while this precluded Plaintiff from performing medium or heavy work, such as his prior work as a hospital cleaner, there were several other unskilled jobs that he could perform at the light level. (R. 203). The second hypothetical posed to the vocational expert, as proposed by Plaintiff, was a residual function capacity to perform light work with the additional limitations of: (1) avoid moderate exposure to extreme cold; (2) avoid

**No. 1:08CV164-MP/AK**

concentrated exposure to vibration; (3) inability to complete a normal workday and workweek without interruptions; and (4) inability to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 204). In response, the vocational expert stated that Plaintiff would be unable to perform any work given these limitations. (R. 204).

## G. **DISCUSSION**

### a) Treating physician opinion

If a treating physician's opinion on the nature and severity of a Plaintiff's impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). Nevertheless, the ALJ may discount the treating physician's opinion if good cause exists to do so. Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's] own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence." Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991), (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)). If an ALJ rejects a treating

**No. 1:08CV164-MP/AK**

physician's opinion, he must give explicit, adequate reasons for so doing, and failure to

do so results in the opinion being deemed accepted as true as a matter of law.

MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); Marbury v. Sullivan, 957

F.2d 837, 841 (11th Cir. 1992).

    The ALJ sufficiently explains why he rejected Dr. Powell's July 2007 assessment.

He did not accord "great weight" to it because it was "inconsistent with the treatment

record and was contradictory" with Dr. Powell's January 2006 opinion, which stated that

Plaintiff could work with restrictions.  (R. 20).  In addition, the non-treating statement at

issue was conclusory.  The ALJ explained that he gave credit to Dr. Powell's treatment

notes and opinions that were supported by objective medical evidence and by the rest

of the record, including other treating physicians' medical opinions; the Plaintiff's daily

activities; location, duration, frequency, and intensity of Plaintiff's symptoms; medication

Plaintiff takes to alleviate symptoms; and treatment for symptoms.  (R. 20).  The ALJ

found that Dr. Powell's 2007 assessment was inconsistent with his previous treatment

notes showing that Plaintiff's Raynaud's was not active during office visits and had

improved since Plaintiff's surgery and was unsubstantiated by any clinical or laboratory

findings.  Thus, the ALJ had good cause for rejecting this opinion.

    In addition, in making his finding that the record showed that Plaintiff's

impairment could "reasonably be expected to produce the alleged symptoms" but not to

the level of "intensity, persistence and limiting effects" that the Plaintiff describes, the

ALJ examined the entire medical record, as well as assessing Plaintiff's daily activities,

**No. 1:08CV164-MP/AK**

which included weekly visits to basketball games and friends' and family's homes.  (R.

17-18).  After his hand surgery in 2004 and calcium blocker medication regimen,

Plaintiff had no occasions of ulcers or tissue infarctions.  In addition, in his most recent

office visit for Raynaud's, Dr. Powell observed that Plaintiff's most recent nerve

conduction studies were within normal limits.  (R. 312).  Accordingly, the ALJ had

substantial evidence to determine that Plaintiff had the residual functional capacity to

perform light work, with the only restrictions being to avoid exposure to cold, vibrating

equipment and caustic chemicals[2].

   b)   Vocational expert

   At the fifth step of the evaluation process, the ALJ must determine whether a

Plaintiff, based on his residual functional capacity, age, education and work experience,

can adjust to other work in the national economy.  20 C.F.R. § 404.1520(a)(4).  The ALJ

may make this determination by reliance upon the Medical Vocational Guidelines or by

utilizing the services of a vocational expert.  Phillips v. Barnhart, 357 F.3d 1232, 1239

(11th Cir. 2004).  When the ALJ uses a vocational expert, he elicits responses from the

expert by posing hypothetical questions to him or her.  Phillips, 357 F.3d at 1240.  In

order for the expert's testimony to constitute substantial evidence to support the ALJ's

findings with regard to this point, the ALJ must pose a hypothetical which includes all of

Plaintiff's impairments.  Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999).  The ALJ

is only required to pose those limitations he finds severe in the hypothetical to the

_____

   [2]  The Plaintiff did not raise as issues supporting disability either his pulmonary
fibrosis or the recently discovered kidney mass.

**No. 1:08CV164-MP/AK**

expert. Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985). However, the ALJ's hypothetical does not need to include "[C]laimant's asserted impairments that are not supported by the medical evidence, or that are controlled or alleviated by medication." Vesy v. Astrue, Slip Copy, 2009 WL 3818751 (11th Cir. 2009) (citing Ingram v. v. Commissioner of Social Security Admin., 496 F.3d 1253, 1270 (11th Cir. 2007 )). Additionally, "the ALJ may disregard vocational testimony given in response to alternate hypotheticals which the ALJ ultimately determines do not accurately portray the claimant's [residual functional capacity]." Griffis v. Astrue, 619 F. Supp. 2d 1215, 1223 (M.D. Fla. 2008) (citing Stephan v. Barnhart, No. 06-2261, 2006 WL 3337489, *5 (E.D. Pa. Nov. 15, 2006).

The first hypothetical reflected the ALJ's proper finding of Plaintiff's residual functional capacity to perform light work with the following restrictions: (1) avoid moderate exposure to extreme cold; and (2) avoid concentrated exposure to vibration. (R. 197). The second hypothetical was proposed by Plaintiff's attorney and included additional restrictions to Plaintiff's residual functional capacity, which the ALJ properly found did *not* apply given the substantial evidence supporting the ALJ's determination that Plaintiff had a residual functional capacity to perform light work, with the only restrictions being to avoid exposure to cold, vibrating equipment and caustic chemicals.

The ALJ did not err by adopting the vocational expert's answer to the first hypothetical and rejecting the vocational expert's answer to the second hypothetical. The hypothetical is only required to include the Plaintiff's impairments found severe by

**No. 1:08CV164-MP/AK**

the ALJ.  <u>Ingram</u>, 496 F.3d at 1270.  The second hypothetical and the vocational expert's subsequent answer were properly not given controlling weight by the ALJ because the second hypothetical contains restrictions that the Plaintiff alleges he suffers but were not supported by objective medical evidence, treating physicians' opinions, the Plaintiff's daily activities, and the record as a whole.

As applied to the ALJ's residual functional capacity finding that Plaintiff was capable of performing light work, the vocational expert's answer to the first interrogatory demonstrated that Plaintiff could perform several unskilled jobs, such as a courier, ticket taker, cashier/ticket seller, and small-products assembler.  (R. 203).

Accordingly, the ALJ properly applied the vocational expert's testimony to find that there are jobs existing in the national economy that Plaintiff is able to perform. Therefore, Plaintiff is not disabled.

Accordingly, it is respectfully **RECOMMENDED**:

That the decision of the Commissioner denying benefits be **AFFIRMED**.

At Gainesville, Florida, this __*1ˢᵗ*__ day of December, 2009.


*s/ A. KORNBLUM*
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**



## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and**

**No. 1:08CV164-MP/AK**

recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.

**No. 1:08CV164-MP/AK**